IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JEREMIAH HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19cv00685 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| AUSTIN K. MCCLAIN, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Jeremiah Henderson filed this civil rights action against Officer Austin McClain of the Roanoke City Police Department alleging violations of 42 U.S.C. § 1983. Henderson contends that, during an encounter at a local Walmart, McClain falsely arrested him while using excessive force and later deceived a magistrate in order to procure a warrant for his arrest. McClain now moves for summary judgment based on qualified immunity. The parties have fully briefed and argued the issues related to summary judgment, and the matter is now ripe for decision. Because McClain's actions were objectively reasonable under the circumstances he encountered, the court will grant his motion for summary judgment.

I.

The material facts underlying this dispute were captured on Officer McClain's body camera and are not genuinely contested. On October 15, 2018, Officer McClain investigated an alleged shoplifting incident at the Valley View Walmart in Roanoke. While McClain interviewed Lindsay Peterson, the loss-prevention manager, a greeter, Jeannette Wheeler, called into the office on her radio expressing fear that a customer was about to strike her. (*See*

ECF No. 42, Ex. D (Incident Video) at 22:00).[1] Upon receiving the call, McClain and Peterson left the office and went to assist Wheeler. When they got to the entrance, Wheeler told them that a customer, Jeremiah Henderson, had been attempting to exit the store when Wheeler asked to see his receipt. Wheeler told McClain that Henderson had refused, eventually growing agitated and threatening to "slap" her and "kick [her] ass." (*Id.* at 22:34.)

While McClain conversed with Wheeler, Thomas Shelton, a Walmart assistant manager, spoke to Henderson. Several seconds later, Shelton informed McClain that he wanted Henderson removed from the store and turned to leave the conversation. As Shelton began to step away, Henderson reached out and grabbed Shelton's arm. Shelton responded by pulling his arm away and shouting: "Whoa whoa whoa!" (*Id.* at 22:51.) As Henderson released Shelton, McClain grabbed Henderson's wrist, telling him "don't put your hands on him." Henderson tried to pull away from McClain for several seconds, leading McClain to twist Henderson's wrist behind his back and instruct him to place both hands behind his back. Henderson continued to resist, stating, "I can't breathe," and requesting his inhaler. (*Id.* at 22:53–23:10.) Eventually, McClain was able to place Henderson in handcuffs, walk him back to the loss prevention office, and offer him his inhaler. McClain then asked Peterson to inquire whether any Walmart employees wished to press charges against Henderson based on the altercation. After speaking with Wheeler and Shelton, Peterson informed McClain that no one wished to press charges, only to bar Henderson from the property. McClain removed

---

[1] Citations to McClain's body-camera footage are in the style "minutes:seconds."

Henderson's handcuffs, gave him a trespass bar letter,[2] and informed him that he was no longer allowed at the Walmart. The entire incident, including the post-encounter exchanges, was captured clearly on McClain's body camera and lasted approximately 15 minutes. (*See* ECF No. 42, Ex. D.)

Four days later, on October 19, a supervisor at the Roanoke Police Department informed McClain that Henderson had filed a complaint against him based on the incident. The supervisor directed McClain to complete a full report of the incident and to inquire personally with Walmart staff about whether they wished to press criminal charges against Henderson. (*See* ECF No. 41-1 at 4.) That same day, McClain returned to Walmart to obtain statements from Peterson, Shelton, and Wheeler, and to ask whether they wished to press charges. These interviews were also captured by McClain's body camera. During his interview, Shelton expressed a desire to press criminal charges, saying: "If he's giving y'all crap, I'll be glad to press charges." (ECF No. 42, Ex. E at 14:58.) Later that day, McClain appeared before a magistrate and testified about the Walmart incident. McClain told the magistrate that he "observed Mr. Henderson in an agitated state grab Mr. Shelton's arm to stop him from walking away as shown on [McClain's] body worn camera video." (ECF No. 41-1 at 4.) The magistrate found probable cause and issued a misdemeanor arrest warrant against Henderson for assault and battery. On October 24, 2018, Roanoke Police served the summons to Henderson. The case was subsequently tried, and a local judge found Henderson not guilty.

---

[2] Under Virginia Code § 15.2-1717.1, an owner of real property may authorize local law enforcement to act as a "person lawfully in charge of the property" for the purpose of forbidding individuals from entering the property. Law enforcement officers exercise this authority by issuing a "trespass bar letter" to the individual.

After his acquittal, Henderson brought this suit against McClain in his individual capacity, seeking money damages under 42 U.S.C. § 1983 for false arrest, malicious prosecution, and use of excessive force. McClain now moves for summary judgment under the doctrine of qualified immunity, arguing that he should be shielded from suit. The court agrees with McClain and will grant his motion for summary judgment. McClain's detention of Henderson on October 15, 2018 was supported by probable cause, and he used a reasonable amount of force to effect that detention. Likewise, the arrest warrant sought by McClain was supported by probable cause to suspect Henderson had committed assault and battery.

## II.

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If that burden has been met, the nonmoving party must then come forward and

establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). When the nonmoving party's version of the facts is clearly contradicted by video evidence, however, the court is not bound to accept its version of events. *See Scott v. Harris*, 550 U.S. 372, 380 (2007). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences

to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

### III.

McClain's motion for summary judgment requires the court to consider whether qualified immunity protects him from Henderson's false arrest, malicious prosecution, and excessive-force claims. The court concludes that McClain should enjoy qualified immunity on all three claims because the uncontested evidence—specifically, the body-camera footage—does not show a violation of any constitutional right.

McClain argues that he is entitled to summary judgment because the doctrine of qualified immunity shields him from suit. It is well-established that qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (cleaned up); *see Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Lucas v. Shively*, 31 F. Supp. 3d 800, 810 (W.D. Va. 2014). Overcoming qualified immunity requires a plaintiff to make two showings: (1) the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) the violation is of a clearly established right of which a reasonable person would have known. *Smith v. Munday*, 848 F.3d 248, 253 (4th Cir. 2017); *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). On summary judgment in a case involving qualified immunity, therefore, the initial question is whether, taking the facts in the light most favorable to the plaintiff, the facts alleged show the officer's conduct violated a constitutional right. *See Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst*, 810 F.3d 892, 899 (4th Cir. 2016).

Taking the facts of this case in the light most favorable to Henderson (and keeping in mind the clear portrayal of the entire incident on McClain's body camera), the facts alleged do not show a violation of any constitutional right.

IV.

A.

Henderson cannot sustain the claimed violation of his Fourth Amendment right to be free from false arrest and malicious prosecution because McClain had a reasonable belief that Henderson had committed or was committing a battery. "The constitutional restrictions on arrest are derived from the Fourth Amendment's prohibition of unreasonable seizures." *Street v. Surdyka*, 492 F.2d 368, 371 (4th Cir. 1974). As in other unreasonable seizure cases, a plaintiff alleging false arrest must demonstrate that he was seized without probable cause. *See Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Brown v. Gilmore*, 278 F.3d 362, 367 (4th Cir. 2002). The contours of this burden shift slightly when the defendant invokes qualified immunity. When evaluating whether an officer is immune from suit based on an allegedly false arrest, the inquiry is not whether probable cause for the arrest actually existed, but whether the officer had a reasonable belief that probable cause existed. *See Porterfield v. Lott*, 156 F.3d 563, 567 (4th Cir. 1998).

The test for malicious prosecution is much the same. A "malicious prosecution claim under § 1983 is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort" of malicious prosecution. *Lambert v. Williams*, 223 F.3d 257, 261 (4th Cir. 2000). To state a claim for malicious prosecution under § 1983, a plaintiff must allege that (1) the defendant seized the plaintiff

- 7 -

pursuant to legal process unsupported by probable cause, and (2) the resulting criminal proceedings terminated in the plaintiff's favor. *See Durham*, 690 F.3d at 188. Because Henderson prevailed in the relevant criminal proceeding, "the sole question at issue is whether there was probable cause to arrest." *Munday*, 848 F.3d at 253. Henderson's false arrest and malicious prosecution claims, therefore, turn on the same probable cause inquiry. *See Rogers v. Pendleton*, 249 F.3d 279, 294 (4th Cir. 2001) (recognizing that false arrest and malicious prosecution claims are often "so intertwined legally" as to rise and fall together for qualified immunity purposes). If McClain had probable cause to arrest Henderson, both claims fail.[3]

Probable cause is a "flexible, common-sense standard" and one that is determined by a "totality of the circumstances approach." *Florida v. Harris*, 568 U.S. 237, 240, 244 (2013) (citing *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "While probable cause requires more than bare suspicion, it requires less than that evidence necessary to convict." *Munday*, 848 F.3d at 253 (quoting *United States v. Gray*, 137 F.3d 765, 769 (4th Cir. 1998)). In determining whether an officer had probable cause, the reviewing court considers whether "the facts and circumstances known to the officer 'would warrant the belief of a prudent person that the arrestee had committed or was committing an offense.'" *Taylor v. Waters*, 81 F.3d 429, 434 (4th Cir. 1996) (quoting *United States v. Garcia*, 848 F.2d 58, 59–60 (4th Cir.), *cert. denied*, 488 U.S. 957 (1988)).

---

[3] The parties dispute whether McClain required probable cause to detain Henderson on October 15, but they agree that the initial encounter was justified based on reasonable suspicion, as set forth in *Terry v. Ohio*, 392 U.S. 1, 12 (1968). Because the parties agree on this point, and the court determines that Officer McClain meets the more demanding standard of probable cause, it need not analyze the encounter under *Terry*.

Officer McClain argues that he had probable cause to believe Henderson had committed the offense of assault and battery under Virginia Code § 18.2-57. (*See* ECF No. 41 at 13–14.) Because that statute does not define assault or battery, Virginia applies the common law definitions of the offenses. *See Clark v. Commonwealth*, 691 S.E.2d 786, 788–789 (Va. 2010). Under those definitions, Henderson committed an assault if he engaged in "an attempt or offer, with force and violence, to do some bodily hurt to another," *Harper v. Commonwealth*, 85 S.E.2d 249, 255 (Va. 1955), and committed a battery if he engaged in "a wil[l]ful or unlawful touching" of another, even if that touching did not "result in injury to the [victim's] corporeal person." *Wood v. Commonwealth*, 140 S.E. 114, 115 (Va. 1927). The Fourth Circuit has summarized Virginia battery law as holding that "the slightest touching of another, or of his clothes, or cane, or anything else attached to his person, if done in a rude, insolent or angry manner constitutes a battery." *Park v. Shiflett*, 250 F.3d 843, 852 (4th Cir. 2001) (citing *Crosswhite v. Barnes*, 124 S.E. 242, 243 (Va.1924)).

The facts and circumstances known to Officer McClain plainly warranted a belief that Henderson had committed or was committing a battery against Shelton under Virginia law. McClain arrived on scene having already heard that Henderson was "about to . . . hit" Wheeler. (ECF No. 42, Ex. D at 22:12.) After he arrived, Wheeler told McClain that Henderson had made multiple violent threats against her—specifically, that he had threatened to "slap" her and "kick [her] ass." (ECF No. 42, Ex. D at 22:34.) Seconds later, as Shelton attempted to leave his conversation with Henderson, McClain observed the agitated Henderson physically accost Shelton. Shelton's reaction to this physical contact, combined with the reported threats and already-threatening atmosphere, made it reasonable to believe that the contact did injury

to Shelton's "mind or feelings." *Wood*, 140 S.E. at 115. These facts, taken together, form the basis for a reasonable belief that Henderson had committed or was committing a battery. Because McClain had probable cause to suspect a battery, he is entitled to qualified immunity on Henderson's false arrest and malicious prosecution claims.

B.

Like Henderson's other two claims, the constitutional provision at issue in his excessive force claim is the Fourth Amendment's prohibition on unreasonable seizures. *See Graham v. Connor*, 490 U.S. 386, 394–396 (1989). *Graham* instructs that the relevant inquiry is whether a given use of force was objectively reasonable, something that depends on "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Taking all these factors into account, the Fourth Circuit has held that the use of handcuffs "rarely" constitutes excessive force "where the officers were justified . . . in effecting the underlying arrest." *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002).

This case is not an exception to that general rule. The three *Graham* factors weigh in McClain's favor. The first factor, the nature of the offense, supports the use of handcuffs because the underlying offense—assault and battery—is a violent one. *See E.W. v. Dolgos*, 884 F.3d 172, 180 (4th Cir. 2018). The second factor, whether the suspect poses a threat to the officer or others, also weighs strongly in McClain's favor. By the time Officer McClain handcuffed Henderson, he had already heard that Henderson had threatened to inflict bodily harm on one Walmart employee and had witnessed Henderson grab another employee. A

reasonable officer in McClain's position would suspect that a more serious disturbance was on the horizon. The third and final factor—whether Henderson was resisting or evading arrest—also cuts in McClain's favor, albeit not as strongly as the other two. Henderson resisted McClain's attempt to detain him, but McClain had already begun the process of handcuffing Henderson before any serious attempts at resistance. Because each of these factors—and the other facts and circumstances of the case—weigh in McClain's favor, his use of handcuffs was objectively reasonable. The reasonableness of his actions entitles him to qualified immunity from suit for use of excessive force.

V.

There are two additional issues before the court. First, Henderson argues that his complaint presents a retaliatory prosecution claim. Having carefully examined the pleadings and subsequent filings, the court can identify no such claim. In order to state a particular claim, a complaint must do at least two things. First, it must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Second, it must plead "more than labels and conclusions" such that its "[f]actual allegations [are] enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Applying that standard, Henderson's complaint alleges only false arrest, malicious prosecution, and excessive force. The complaint makes two conclusory accusations that McClain's motive in seeking arrest was retaliatory, but there are no specific factual allegations in the complaint relating to a retaliatory prosecution claim. Therefore, the complaint cannot be read to state a claim for relief under that theory.

Henderson cites *Nieves v. Bartlett*, 139 S. Ct. 1715 (2019), to argue that the court should nevertheless read a retaliatory prosecution claim into his complaint because such a claim is subsumed within his malicious prosecution claim. This argument is refuted by clear Supreme Court precedent. While some elements of malicious prosecution resemble elements of a retaliatory prosecution claim, they are analytically and legally distinct. *See Nieves*, 139 S. Ct. at 1726 (treating malicious arrest and retaliatory arrest as distinct claims); *Hartman v. Moore*, 547 U.S. 250, 258 (2006) (treating malicious prosecution and retaliatory prosecution as distinct claims). As noted above, malicious prosecution under § 1983 is based in the Fourth Amendment and requires a plaintiff to show that he was arrested without probable cause and prevailed in the subsequent legal proceeding. Retaliatory prosecution, in contrast, is a First Amendment claim and requires a plaintiff to show that they were subject to retaliatory action for engaging in protected speech, that the government defendant's retaliatory animus was the "but for" cause of the plaintiff's injury, and that "the decision to press charges was objectively unreasonable because it was not supported by probable cause." *Nieves*, 139 S. Ct. at 1722–23. Indeed, *Nieves* itself explicitly recognizes that malicious prosecution and retaliatory arrest are distinct torts. *See id.* at 1726. It would be improper, therefore, for the court to infer a retaliatory prosecution claim from Henderson's malicious prosecution pleadings.[4]

## VI.

Finally, McClain has moved to enjoin related state-court proceedings that he contends were initiated in an attempt to thwart this removal action and undermine the court's authority.

---

[4] Had Henderson alleged, as a separate and distinct First Amendment claim for retaliatory arrest or prosecution, that his complaint was protected speech and McClain's retaliatory animus based on that complaint was the but for cause of his arrest, this case may have presented a closer question on the effect of probable cause and, relatedly, the application of qualified immunity.

(ECF No. 62). The motion is based on a putative amendment to Henderson's complaint that attempted to add a raft of state-law claims under this court's supplemental jurisdiction. Henderson withdrew his motion to add these state-law claims after McClain opposed the amendment and before the court could rule on the motion.[5] Henderson then filed those claims in Roanoke Circuit Court. In support of his motion to enjoin the state-court proceeding, McClain cites a number of cases wherein federal courts enjoined copycat state-court proceedings filed to subvert federal jurisdiction. *See e.g.*, *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.*, 77 F.3d 1063 (8th Cir. 1996); *Faye v. High's of Balt.*, 541 F. Supp. 2d 752 (D. Md. 2008).[6] The facts of these cases are not analogous and do not lend support for the requested remedy. All of these cases fall into one of two categories: Either the plaintiffs' claims in state court were identical to claims in ongoing federal litigation, or the plaintiffs amended their federal complaint to withdraw state-law claims that they subsequently refiled in state court. Neither is true here. Henderson's state-court suit is composed entirely of state-law claims not present in this case and over which this court has never exercised jurisdiction. Without any overlap in the claims at issue, this court discerns no threat to its jurisdiction from the ongoing state-court litigation or an attempt by Henderson to undermine its jurisdiction over the federal claims. Absent these concerns, the court will not take the extraordinary step of enjoining a state-court proceeding. *Cf. Atl. Coast Line R. Co. v. Bhd. of Locomotive Eng'rs.*, 398

---

[5] The Hon. Glen E. Conrad initially presided over this case while this motion was pending. By the time Judge Conrad transferred the matter to the undersigned in September 2020, Henderson had withdrawn his motion.

[6] McClain also cites *Davis International, LLC v. New Start Group Corp.*, 488 F.3d 597 (3d Cir. 2007), claiming the Third Circuit in that case reversed a district court denial of an injunction. (*See* ECF No. 70 at 6–7.) The Third Circuit reached no such holding in that case, nor could it have. A district court's decision whether to enjoin state-court proceedings under the Anti-Injunction Act "is always discretionary." *Ackerman v. ExxonMobil Corp.*, 734 F.3d 237, 252 (4th Cir. 2013).

U.S. 281, 287 (1970) ("Proceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts."); *Younger v. Harris*, 401 U.S. 37, 45 (1971) ("[T]he normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions."); *Mitchum v. Foster*, 407 U.S. 225, 243 (1972) ("[T]he principles of equity, comity, and federalism … must restrain a federal court when asked to enjoin a state court proceeding.").

The motion to enjoin will therefore be denied.

## VII.

For all these reasons, McClain's motion for summary judgment will be granted, and McClain's motion to enjoin state court proceedings will be denied.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

**ENTERED** this 19th day of October, 2020.

_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE